IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYSIA FENDERSON, | ) | CASE NO.  1:14-cv-1714 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lysia Fenderson ("Plaintiff" or "Fenderson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Fenderson protectively filed an application for Supplemental Security Income ("SSI") on

August 28, 2012.[1]  Tr. 11, 154-162, 171.   She alleged a disability onset date of February 1,

2010 (Tr. 11, 154, 171), and alleged disability due to post-traumatic stress disorder, paranoia,

depression, hearing voices, back problems, and pain in both hands with a previous injury to both

thumbs (Tr. 73, 88, 175).   Fenderson's application was denied initially and upon reconsideration

by the state agency.  Tr. 102-104, 112-116.   Thereafter, she requested an administrative hearing.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 8/25/2015).

Tr. 117-119.   On November 15, 2013, Administrative Law Judge Eric Westley ("ALJ") conducted an administrative hearing.  Tr. 31-71.

In his December 13, 2013, decision, the ALJ determined that Fenderson had not been under a disability since August 28, 2012, the date the application was filed.  Tr. 8-30.  Fenderson requested review of the ALJ's decision by the Appeals Council.  Tr. 7.  On June 23, 2014, the Appeals Council denied Fenderson's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational and vocational evidence

Fenderson was born in 1961.  Tr. 37, 154, 171.  She was 52 years old at the time of the hearing and lived with her mother.  Tr. 37.  She completed school through the 10th grade.  Tr. 37, 176.  Fenderson is single and she has one adult daughter, a grandson and granddaughter.  Tr. 38. Fenderson was incarcerated from 2009 to 2012.[2]  Tr. 40-43.  Fenderson's past work included work as a laborer and fast food worker.[3]  Tr. 60, 210-211.   In 2002, Fenderson worked with Minute Men doing "picking and packing" work, and in 2001 and 2002, she worked at McDonalds for about six months.  Tr. 44-45, 54-55, 58-59.  While at McDonalds, Fenderson was asked to work on the cash register but she was not good with math so she helped stock the refrigerator, worked on the grill, and cleaned the dining room area.  Tr. 45, 56.

---

[2] Her incarceration was for robbery, aggravated burglary, and "escape."  Tr. 306.  Fenderson indicated the "escape" charge involved walking out of a treatment center.  Tr. 41.  She had previously been incarcerated for other charges. Tr. 305-306.

[3] When Fenderson was released from prison in 2012,  she attempted to work for the Salvation Army for one week ringing a bell but she was unable to do the work because of pain in her back and because of the problems with her hands.  Tr. 39-40.

**B.**     **Medical evidence[4]**

**1.**     **Treatment history**

Following her release from prison on August 27, 2012, on August 30, 2012, Fenderson underwent an Adult Diagnostic Assessment at the Nord Center.[5]  Tr. 273-283.  Christa L. Pultrone, LSW, and Amber L. Hill, Ph.D., LPCC-S, completed the Assessment.  Tr. 283. Fenderson reported auditory hallucinations, which included voices telling her to use drugs and that she was not worth anything.  Tr. 280.  She also reported poor sleep and being on Seroquel in the past through the Nord Center.  Tr. 280.  She had not, however, been on psychiatric medication for three years.  Tr. 280.  Fenderson reported that she was close with her family.  Tr. 273.  Ms. Pultrone and Dr. Hill diagnosed adjustment disorder with mixed anxiety and depressed mood and cocaine and cannabis dependence (both in reported sustained full remission), with rule out diagnoses of psychotic disorder, NOS, and antisocial personality disorder.  Tr. 281.  They assessed a GAF score of 61, indicating some mild symptoms.[6]  Tr. 281.

Fenderson received individual counseling from the Nord Center in 2012 and 2013.  *See e.g.*, Tr. 425-426 (9/13/2012); Tr. 423-424 (10/17/2012); Tr. 323-324 (10/31/2012); Tr. 320-321 (11/13/2012); Tr. 319-320 (11/27/2012); Tr. 317-318 (12/20/2012); Tr. 421-422 (1/16/2013); Tr.

---

[4] Since Fenderson does not challenge the ALJ's findings regarding her physical impairments, the medical evidence summarized herein relates to Fenderson's mental impairments.

[5] While incarcerated, Fenderson was not seen for mental health services.  Tr. 244.  Fenderson indicated that, prior to being sent to prison, a Nord Center counselor instructed her not to seek mental health treatment or take medication while incarcerated and to return to Nord Center once released.  Tr. 57, 307.

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

413-414 (2/6/2013).[7]  Fenderson continued to report poor sleep and auditory hallucinations.  Tr. 317, 319, 421.  In November 2012, Fenderson reported attending AA and NA meetings three times per week, taking short walks, watching television, and going to church once a week.  Tr. 319.  Fenderson agreed to become more active by volunteering more at her church and spending time with her neighbor.  Tr. 319.

On January 22, 2013, Fenderson underwent a psychiatric evaluation at the Nord Center, which was completed by Dr. Margaret Messerly, M.D.  Tr. 415-420.  Fenderson reported symptoms of depression, anxiety, flashbacks, nightmares, sadness, crying, loss of appetite, inability to eat, loss of weight, daily chronic pain and muscle tension, poor sleep and a desire to isolate.  Tr. 415.  She also reported hearing voices of corrections officers and checking her watch for "count time," which is the process of remaining silent and being counted four times each day while in prison.  Tr. 415.  In addition to hearing the voices of corrections officers, Fenderson also reported hearing the voices of her fiancé, sister and aunt, all of whom had passed away.  Tr. 415.  Fenderson indicated that she was "tired of thinking [she] was still in prison."  Tr. 415.  She was attending AA meetings two to three times per week.  Tr. 415.  Fenderson was interested in participating in counseling and receiving psychiatric services.  Tr. 415.  She indicated that in the past Seroquel had helped her with sleep and voices.  Tr. 415.  Dr. Messerly diagnosed major depressive disorder, recurrent, with psychotic features; and cocaine and cannabis dependence (both in reported sustained full remission).  Tr. 417.  Rule out diagnoses included schizoaffective disorder and antisocial personality disorder.  Tr. 417.  Dr. Messerly assessed a GAF score of 61.  Tr. 417.  Dr. Messerly prescribed Cymbalta and Risperdal.  Tr. 418.

On February 20, 2013, Fenderson saw Dr. Messerly for follow up.  Tr. 411-412.  Fenderson reported that the Cymbalta and Risperdal were providing her no relief from her

---

[7] Duplicate copies of Nord Center treatment records are located in the transcript at Exhibit 11F (Tr. 444-476).

symptoms.  Tr. 411.  Fenderson reported "broken sleep, nightmares, hearing voices and sounds, ongoing thoughts of prison and 'count time' as well as excessive worry and sadness."  Tr. 411. Dr. Messerly noted that Fenderson's mood/affect was "flat, sad, restricted;" her thought process/orientation was "concrete, insight is limited," and her behavior/functioning was "poor eye contact, decreased psychomotor activity[,] low energy."  Tr. 411.  Dr. Messerly recommended that Fenderson discontinue Risperdal and start a trial of Seroquel.  Tr. 411.  Dr. Messerly also discontinued Cymbalta and started Fenderson on a trial of Zoloft for mood symptoms.  Tr. 411.  Fenderson continued to see Dr. Messerly (Tr. 405-406 (3/27/2013); Tr. 403-404 (4/24/2013); Tr. 401-402 (6/5/2013); Tr. 395-396 (7/24/2013)) and counselors at the Nord Center throughout 2013 (Tr. 409-410 (3/6/2013); Tr. 407-408 (3/27/2013); Tr. 399-400 (6/5/2013); Tr. 397-398 (7/3/2013); Tr. 393-394 (7/30/2013); Tr. 391-392 (8/22/2013)).[8]

On March 27, 2013, Fenderson saw Dr. Messerly.  Tr. 405-406.  She reported that she had been able to sleep and she felt less fearful/obsessed about watching the clock.  Tr. 405.  She reported that she was continuing to feel depressed and overwhelmed with chronic pain.  Tr. 405. Fenderson's mood/affect was ""flat, blunted, 'sad and in pain.'"  Tr. 405.  Fenderson also saw her counselor on March 27, 2013.  Tr. 407-408.  Fenderson had been going to AA twice a week, going on walks, reading her Bible and watching the news.  Tr. 407.  She reported feeling stressed.  Tr. 407.

On June 5, 2013, Fenderson reported to Dr. Messerly that Seroquel had "helped some with sleep, bad dreams and hearing C.O.s [corrections officers]."  Tr. 401.  She had been taking Lyrica in addition to Cymbalta for her fibromyalgia so Fenderson had not been taking Zoloft. Tr. 401.  Fenderson continued to report high anxiety and intrusive memories of being incarcerated.  Tr. 401.  She was feeling on edge and uncomfortable around others.  Tr. 401.  Dr.

---

[8] Duplicate copies of Nord Center treatment records are located in the transcript at Exhibit 11F (Tr. 444-476).

Messerly observed that Fenderson was "restricted [and] anxious." Tr. 401. Her "psychomotor activity [was] decreased." Tr. 401. Fenderson had no tears that day and she initiated conversation better. Tr. 401.

On July 24, 2013, Fenderson reported to Dr. Messerly feelings of sadness and fear due to the stress of her physical health[9] and financial problems. Tr. 395. She was sleeping better with the Seroquel. Tr. 395. She was still hearing the corrections officers' voices but it was not as bad as it had been. Tr. 395.

On August 22, 2013, Fenderson saw one of her counselors (Tr. 391-392) who noted that Fenderson's mood/affect was "anxious, restricted, depressed" and Fenderson was worried and traumatized from prison (Tr. 391). Fenderson was cooperative but had limited eye contact, was quiet and was continuing to wear a coat and gloves even in warm weather. Tr. 391. Fenderson was on a waiting list for housing. Tr. 391. She liked living with her mother but felt she had no space for herself in the one room house they lived in. Tr. 391. If she obtained housing, she was going to consider having a family member live with her. Tr. 391.

### 2. Medical opinion evidence

#### a. Treating psychiatrist

_March 27, 2013, Medical Source Statement_

On March 27, 2013, Dr. Messerly opined that Fenderson's mental impairments caused limitations in her ability to understand, remember and carry out instructions and in her ability to interact appropriately with supervisors, co-workers, and the public and respond to changes in a routine work setting. Tr. 388-390.

In the area of understanding, remembering and carrying out instructions, Dr. Messerly opined that Fenderson had mild limitations in her ability to carry out simple instructions;

---

[9] Fenderson reported a new diagnosis of uterine fibroids and ongoing pain.  Tr. 395.

moderate limitations in her ability to understand and remember simple instructions and make judgments on simple work-related decisions; marked limitations in her ability to carry out complex instructions and and make judgments on complex work-related decisions; and extreme limitations in her ability to understand and remember complex instructions.  Tr. 388.  Dr. Messerly indicated that the foregoing limitations were supported by Fenderson's "high anxiety, sad mood, poor concentration and memory."  Tr. 388.

In the area of interacting appropriately with supervisors, co-workers and the public as well as responding to changes in a routine work setting, Dr. Messerly opined that Fenderson had marked limitations in her ability to interact appropriately with the public and co-workers and in her ability to respond appropriately to usual work situations and to changes in a routine work setting; and extreme limitations in her ability to interact appropriately with supervisors.  Tr. 339. Dr. Messerly indicated that the foregoing limitations were supported by Fenderson's "[h]istory of anxiety and trauma with authority figures."  Tr. 389.  Dr. Messerly also indicated that Fenderson "avoids leaving home [and was] uncomfortable around other people."  Tr. 389.  Dr. Messerly indicated that she first saw Fenderson on January 22, 2013, and Fenderson reported having symptoms since 2009.  Tr. 389.  Dr. Messerly also noted that there had been no substance use since 2009.  Tr. 389.

### *November 21, 2013, Medical Source Statement*

On November 21, 2013, Dr. Messerly opined that Fenderson's mental impairments caused limitations in her ability to understand, remember and carry out instructions and in her ability to interact appropriately with supervisors, co-workers, and the public and respond to changes in a routine work setting.  Tr. 551-553.

In the area of understanding, remembering and carrying out instructions, Dr. Messerly opined that Fenderson had no impairments in her ability to carry out simple instructions; mild limitations in her ability to understand and remember simple instructions; moderate limitations in her ability to make judgments on simple work-related decisions; and marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  Tr. 551.  Dr. Messerly indicated that the foregoing limitations were supported by the fact that Fenderson "[d]emonstrates high anxiety, limited comprehension and poor decision making skills."  Tr. 551.

In the area of interacting appropriately with supervisors, co-workers and the public as well as responding to changes in a routine work setting, Dr. Messerly opined that Fenderson had marked limitations in her ability to interact appropriately with the public and co-workers and in her ability to respond appropriately to usual work situations and to changes in a routine work setting; and extreme limitations in her ability to interact appropriately with supervisors.  Tr. 552. Dr. Messerly indicated that the foregoing limitations were supported by Fenderson's "[d]ifficulty expressing herself in assertive manner with authority figures [and][h]istory of PTSD symptoms." Tr. 552.

### b.    Consultative psychologist

On November 12, 2012, consultative clinical psychologist Ronald G. Smith, Ph.D., saw Fenderson and conducted an adult clinical interview.  Tr. 304-312.  Dr. Smith's diagnoses included post traumatic stress disorder; and alcohol, cannabis and crack cocaine abuse (in enforced three year remission).  Tr. 310.  Dr. Smith also diagnosed Fenderson with "borderline

intellectual functioning (estimated)."  Tr.  310.  Dr. Smith assessed a GAF score of 45.[10]  Tr.

311.  In assessing Fenderson's functional abilities, Dr. Smith opined that: (1) Fenderson would

have difficulty understanding, remembering and carrying out job instructions, noting that she can

read simple instructions but may have difficulty remembering and carrying them out because of

her preoccupation with traumatic events she experienced in prison; (2) Fenderson would have

difficulty maintaining adequate attention and concentration as well as in maintaining persistence

in the performance of even simple tasks because of her preoccupation with the trauma of her

recent prison term; (3) Fenderson may have difficulty effectively dealing with supervisors

because of her experience with corrections officers in prison who she recalls as being abusive,

loud and demeaning; and (4) Fenderson may not deal effectively at all with work pressures

arising in a job situation, indicating that Fenderson described herself as being depressed and

appeared to be having some difficulty adjusting to life outside prison.  Tr. 311.

           c.       State agency psychologist

_November 12, 2012_

       On November 20, 2012, state agency reviewing psychologist Roseann Umana, Ph.D.,

completed a Psychiatric Review Technique (Tr. 78-79) and a Mental RFC Assessment (Tr. 82-

84).  Dr. Umana opined that Fenderson had mild restrictions in activities of daily living and

moderate difficulties in maintaining social functioning and maintaining concentration,

persistence or pace.  Tr. 78.

       More particularly, in the Mental RFC Assessment, in the area of "understanding and

memory," Dr. Umana opined that Fenderson was moderately limited in her ability to understand

and remember detailed instructions.  Tr. 82.

---

[10]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends,
unable to keep a job)."  _See_ DSM-IV-TR, at 34.

In the area of "sustained concentration and persistence," Dr. Umana opined that Fenderson was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 82-83.

In the area of "social interaction," Dr. Umana opined that Fenderson was moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers and peers without distracting them or exhibiting behavioral extremes.  Tr. 83.

In the area of "adaptation," Dr. Umana opined that Fenderson was moderately limited in her ability to respond appropriately to changes in the work setting.  Tr. 83-84.

In narrative form, Dr. Umana explained that, based on Fenderson's limitations, Fenderson would be "able to understand[,] remember and carry out simple instructions and some that are more complex[;]" Fenderson "appear[ed] capable of adequate concentration for SRT's [simple, routine tasks] with regular breaks[;]" "[s]tress tolerance [was] limited" and Fenderson could "adapt to work settings in which duties are routine and predictable[;]" Fenderson could "be limited to superficial encounters with the general public, coworkers and supervisors[;]" and Fenderson could "be limited to low stress, low production work in a relaxed setting with minimal routine changes."  Tr. 82-84.

*January 31, 2013*

On reconsideration, on January 31, 2013, state agency reviewing psychologist Karla Voyten, Ph.D., completed a Psychiatric Review Technique (Tr. 93-94) and Mental RFC Assessment (Tr. 97-99).  Dr. Voyten rated Fenderson as having the same limitations as found by

10

Dr. Umana.  Tr. 93-94, 97-99.  However, Dr. Voyten's narrative descriptions of Fenderson's limitations varied slightly from Dr. Umana.  Tr. 97-99.  In narrative form, Dr. Voyten explained that, based on Fenderson's limitations, Fenderson could "understand and remember 1-4 step instructions[;]" Fenderson was "capable of sustaining concentration and persistence on 1-4 step tasks in a setting void of fast pace[;]" Fenderson could "be limited to superficial encounters with general public, coworkers and supervisors[;]" and Fenderson was "capable of adapting to infrequent changes in a static work setting."  Tr. 97-99.

**C.     Testimonial evidence**

**1.       Plaintiff's testimony**

Fenderson was represented and testified at the hearing.  Tr. 36-58, 59.   While in prison, Fenderson participated in a program to help with behavioral issues and drug addictions.  Tr. 43. She tries to attend AA or NA two to three times each week.  Tr. 43.  She also attends church on Sunday and Bible study on Wednesday evenings.  Tr.  43-44.

While Fenderson was in prison, she slammed both of her hands in a lockbox.  Tr. 45-46. As a result, Fenderson has knots in both of her thumbs and she has been told that she has arthritis in both hands.  Tr. 46, 54.  She gets sharp pain in both hands; sometimes her hands go numb; and it is difficult for her to grip things.  Tr. 46.  For example, recently she was unable to twist the cap off a bottle of ketchup.  Tr.  46-47, 56.  Also, she has difficulty brushing/combing her hair because it causes so much pain in her hands.  Tr. 47, 56.  Fenderson has taken Tramadol as well as Vicodin for pain but it does not really work.  Tr. 47-48, 53-54.  She also takes Neurontin for her pain.  Tr. 54.  Fenderson also has problems with her left shoulder.  Tr. 48.  She does not think she can lift over 20 pounds.  Tr.  48.  Fenderson tries to help her mom around the house but is

not able to do too much. Tr. 48-49. After taking a walk around the block, Fenderson has to sit and rest and then lie down and take medication for her back. Tr. 49.

Dr. Messerly has prescribed Zoloft and Seroquel, which helps Fenderson sleep but she is still depressed and stressed out. Tr. 51. She does not want to be around anyone; she does not want to talk with anyone and she does not have an appetite. Tr. 51. Fenderson has intrusive thoughts, including hearing the corrections officers from prison hollering at her, calling out her name, hitting and slamming doors. Tr. 52. She also thinks about her sister who died and talks with her. Tr. 52. Sometimes, Fenderson feels like she is nothing and will never have a life. Tr. 52. She feels closed in at her mom's home. Tr. 53. She leaves the house to go to the store with her mom, for doctor/counselor appointments, for AA and NA meetings, and to take a walk around the block. Tr. 52-53. Dr. Messerly has told Fenderson that working would not be good for Fenderson because she is too stressed out, still hears voices, and is not good with authority. Tr. 53.

### 2. Vocational Expert's testimony

Vocational Expert ("VE") Stephen P. Davis testified at the hearing. Tr. 58-70. The VE discussed and described Fenderson's past work as a laborer as unskilled, medium work and her past work as a fast food worker as unskilled, light work. Tr. 60.

The ALJ proceeded to ask the VE hypothetical questions. Tr. 60. First, the ALJ asked the VE to assume a hypothetical individual of the same age and with the same education and past work experience as Fenderson who can lift or carry 20 pounds occasionally and 20 pounds frequently; can stand or walk 6 hours out of an 8-hour day; can sit for 6 hours out of an 8-hour day; can occasionally operate hand controls bilaterally; can occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; can frequently handle and finger bilaterally; can

perform one to four-step instructions in a setting with no fast pace and no more than infrequent changes; and interaction with supervisors, co-workers and the public is limited to speaking and signaling.  Tr. 60-61.  The VE indicated that the described individual would be unable to perform Fenderson's past work but there were other jobs that the individual could perform, including (1) cashier, self-service, an unskilled, light position with approximately 22,000 jobs available in Ohio and 398,000 nationwide; (2) cashier, parking lot, an unskilled, light position with approximately 5,100 jobs in Ohio and 198,000 nationwide; and (3) investigator, dealer accounts, an unskilled, light position with approximately 3,600 jobs in Ohio and 211,000 nationwide.  Tr. 61-62.

For his second hypothetical question, the ALJ asked the VE to assume the individual described in the first hypothetical with the additional restriction that the individual would be limited to occasional handling and fingering bilaterally.  Tr. 62.  The VE indicated that the additional limitation would eliminate the two cashier positions but the investigator, dealer accounts, position would remain available.  Tr. 62.  The VE indicated that other available jobs would be (1) scaling machine operator, an unskilled, light position with approximately 1,900 jobs in Ohio and 31,000 nationwide; and (2) ironer, an unskilled, light position with approximately 1,600 in Ohio and 89,000 nationwide.  Tr. 64.

For his third hypothetical, the ALJ asked the VE to assume the individual described in the second hypothetical except the individual would be limited to sedentary work.  Tr. 65.  The VE indicated that there would be jobs available to the described individual, including (1) surveillance system monitor, an unskilled, sedentary position with approximately 5,000 jobs available in Ohio and 200,000 nationwide; and (2) election clerk, an unskilled, sedentary position with approximately 3,200 jobs available in Ohio and 389,000 nationwide.  Tr. 65.

For his fourth hypothetical, the ALJ asked the VE whether an individual who would be off-task 20 percent of the time could perform Fenderson's past work or other jobs in the economy.  Tr. 66.  The VE indicated that the described individual would be unable to perform Fenderson's past work or any other jobs in the economy because of the limit of 15 percent off-task at the unskilled level.  Tr. 66.

In response to Fenderson's counsel's questions, the VE indicated that at the sedentary level there would be significant erosion if an individual does not have good use of her hands bilaterally.  Tr. 66.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

**IV. The ALJ's Decision**

In his December 13, 2013, decision, the ALJ made the following findings:[13]

1.      Fenderson has not engaged in substantial gainful activity since August 28, 2012, the application date.  Tr. 13.

2.      Fenderson has the following severe impairments: spine disorder, degenerative joint disease of the right and left thumbs, bilateral carpal tunnel syndrome, and affective disorders.  Tr. 13.  Fenderson's polysubstance abuse is a non-severe impairment.  Tr. 13.

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

[13] The ALJ's findings are summarized.

3.    Fenderson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 13-15.

4.    Fenderson has the RFC to perform light work, with restrictions. She can lift and carry up to 20 pounds occasionally and 10 pounds frequently. In an 8-hour workday, she can stand and/or walk for 6 hours and sit for 6 hours. She can occasionally operate hand controls, bilaterally. She cannot climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs. She can frequently stoop, kneel and crouch and occasionally crawl. She can frequently handle and finger, bilaterally. She can perform one to four-step instructions in a setting with no fast pace and no more than infrequent changes. Interaction with supervisors, coworkers and the public is limited to speaking and signaling. Tr. 15-23.

5.    Fenderson is unable to perform past relevant work. Tr. 24.

6.    Fenderson was born in 1961 and was 51 years old when the application was filed. Tr. 24.

7.    Fenderson has limited education and is able to communicate in English. Tr. 24.

8.    Transferability of job skills is not an issue because Fenderson's past relevant work was unskilled. Tr. 24.

9.    Considering Fenderson's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Fenderson could perform, including cashier, self-service; cashier, parking lot; and investigator, dealer accounts. Tr. 24-25.

Based on the foregoing, the ALJ determined that Fenderson had not been under a disability since August 28, 2012, the date the application was filed. Tr. 25.

## V. Parties' Arguments

Fenderson argues that the ALJ erred by granting only little weight to the opinions of her treating psychiatrist Dr. Messerly. Doc. 16, pp. 8-12. Fenderson also argues that substantial evidence does not support the ALJ's mental RFC social limitations and that the VE testimony relied upon by the ALJ, which was based on a hypothetical question that included only those

16

limitations contained in the RFC, was inadequate and cannot constitute substantial evidence. Doc. 16, pp. 12-15.

In response, the Commissioner argues that the ALJ properly considered and explained the weight assigned to Dr. Messerly's opinions and the ALJ' decision is supported by substantial evidence.  Doc. 18, pp. 6-9.  The Commissioner also argues that the ALJ reasonably evaluated the other opinion evidence and Fenderson's credibility when assessing Fenderson's RFC and properly relied upon the VE's testimony in response to a VE hypothetical question containing the same limitations as those included in the RFC.   Doc. 18, pp. 9-13.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **The ALJ properly considered the opinions of treating psychiatrist Dr. Messerly**

Fenderson challenges the ALJ's decision to assign less than controlling weight to the opinions of her treating psychiatrist Dr. Messerly.  Doc. 16, pp. 8-12.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ considered and discussed at length Fenderson's mental health treatment history

(Tr. 14-15, 19-20) and, consistent with the treating physician rule, discussed and explained the

weight assigned to Dr. Messerly's two medical opinions, stating:

> Margaret Messerly, M.D., completed a questionnaire regarding the claimant's mental capacity on March 27, 2013 (Exhibit 8F).  She indicated that the claimant has extreme limitations, *i.e.,* no useful ability to function, with regarding to understanding and remembering complex instructions and interacting appropriately with supervisors.  She stated that the claimant has marked limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with coworkers and the public, and respond appropriately to usual work situations and changes in a routine setting.  Dr. Messerly determined that the claimant has moderate limitations in understanding and remembering simple instructions and making judgments on simple work-related decisions.  Dr. Messerly stated that the claimant has a history of anxiety and trauma with authority figures, she avoids leaving her home and is uncomfortable around others.  Dr. Messerly issued this statement after meeting with the claimant three times.  She indicates that the claimant has very severe limitations, which is inconsistent with her previous designation of a GAF score of 61, indicating mild symptoms (Exhibit 9F, p. 27).  Dr. Messerly also stated that the claimant avoids leaving her home; however, this is inconsistent with the claimant's own report to her mental health providers that she attends support group meetings two to four times a week, attends church twice a week, and visits her grandchildren a couple times a week (Exhibits 6F, pp. 5 and 9 and 9F, p. 17).  Dr. Messerly issued this opinion early in her treatment of the claimant and before the claimant reported some improvement in her symptoms with medications (Exhibit 9F, pp. 11 and 13).  For these reasons, the undersigned did not give full weight to Dr. Messerly's opinion.

> Dr. Messerly completed a second questionnaire regarding the claimant's mental capacity on November 21, 2013 (Exhibit 16F).  In this opinion, Dr. Messerly determined that the claimant has extreme limitations in her ability to interacting appropriately with supervisors and marked limitations in her ability to understand, remember and carry out complex instructions, make judgments on complex work-related decisions, respond appropriately to usual work situations and changes in routine work setting, and interact appropriately with the public and coworkers.  She stated that the claimant has moderate limitations in her ability to make simple work-related decisions, mild limitations in understanding and remembering simple instructions and no limitations in carrying out simple instructions.  Dr. Messerly reported that the claimant has high anxiety, limited comprehension, poor decision-making skills and difficulty expressing herself in an assertive manner

with authority figures.  The undersigned [gave] little weight to Dr. Messerly's opinions regarding interpersonal interactions, because they are inconsistent with the evidence as a whole.  As discussed in the paragraph above, the evidence shows that the claimant is able to attend support groups, attend church, and maintain familial relationships (Exhibits 6F, pp. 5 and 9 and 9F, p. 17).  The claimant is also able to interact with her neighbors, shop and go to the laundromat (Exhibits 4E, pp. 7-8 and 6F, p. 7).  These activities demonstrate a greater ability in social functioning than Dr. Messerly suggests.  The undersigned gave full weight to Dr. Messerly's opinion regarding the claimant's ability to understand, remember and carry out simple instructions, but it is consistent with the evidence and the claimant's ability to care for her personal needs, prepare simple meals, perform household chores, launder and shop (Exhibit 4E, pp. 7-8).

Tr. 20-21.

The ALJ explained that Dr. Messerly's opinion was not entitled to controlling weight because it was inconsistent with the record as whole, assigning only little weight to Dr. Messerly's limitations regarding interactions with others.  Tr. 20-21.  Fenderson contends that the medical records support Dr. Messerly's limitations, including those relating to social limitations and therefore argues that the ALJ erred in not providing controlling weight to the entirety of Dr. Messerly's opinion.[14]  Doc. 16, pp. 8-12.  In support of her argument, Fenderson details evidence found in her mental health treatment records, such as auditory hallucinations, obsession with prison "count time," being anxious, having poor sleep, and isolating.  Doc. 16, p. 11.  However, since the ALJ discussed Fenderson's mental health treatment history, including the evidence Fenderson points to in support of her claim that Dr. Messerly's opinions were consistent with the record as a whole (Tr. 19-21), Fenderson's argument amounts to a request that this Court reweigh evidence already considered by the ALJ, which this Court may not do.  See Garner, 745 F.2d 383, 387 (6th Cir. 1984) (A court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility.").

---

[14] Fenderson does not clearly articulate separate arguments with respect to Dr. Messerly's first and second opinion.  Her argument is focused on the ALJ's determination that Dr. Messerly's opinion regarding Fenderson's social limitations was entitled to little weight.  Doc. 16, pp. 10-12.

Further, even if Fenderson could demonstrate that her mental health records provide support for her claim, since there is substantial evidence to support the ALJ's decision, the Court may not overturn the Commissioner's decision.  *Jones*, 336 F.3d at 477.  For example, the ALJ found Dr. Messerly's severe limitations inconsistent with Dr. Messerly's assessment of a GAF score of 61, indicative of mild symptoms.  Tr. 20.  Additionally, in finding Dr. Messerly's marked and extreme social limitations inconsistent with the record as a whole, the ALJ considered and found that Fenderson's own reports of her participation in various activities, such as attending support groups and church, maintaining familial relationships, shopping and going to the laundromat, demonstrated greater ability in social functioning than suggested by Dr. Messerly.   Tr. 20-21.

Fenderson also claims that the ALJ was required to provide controlling weight to the marked and extreme limitations of Dr. Messerly because consultative examining psychologist Dr. Smith and the state agency reviewing psychologists also found social limitations.  Doc. 16, pp. 11-12.  That argument is without merit.  While Dr. Smith and the state agency reviewing psychologists offered opinions suggesting social interaction limitations (Tr. 78, 83, 94, 99, 311), their opinions were less restrictive than Dr. Messerly's marked and extreme limitations in social interaction (552).  For example, Dr. Smith opined that Fenderson "*may* have difficulty dealing effective with supervisors . . ." ((Tr. 311)(emphasis supplied)) and the state agency reviewing psychologists opined that Fenderson had moderate limitations in social functioning and could engage in "superficial encounters with the general public, coworkers and supervisors" (Tr. 78, 83, 94, 99).

Fenderson's further suggestion that, because the ALJ gave weight to certain portions of Dr. Messerly's opinions, i.e., Dr. Messerly's opinion regarding Fenderson's ability to

understand, remember and carry out simple instructions, the ALJ's decision not to provide weight to Dr. Messerly's opinion regarding Fenderson's social limitations amounts to reversible error is also without merit.  Doc. 16, p. 11.  Consistent with the treating physician rule, the ALJ made clear which portions of Dr. Messerly's opinions he found supported by and consistent with the evidence as a whole and those that he did not (Tr. 20-21) and Fenderson has not provided supporting legal authority for the proposition that the assignment of weight to one portion of an opinion requires assignment of weight to other portions of that same opinion.

Since the ALJ considered the evidence as a whole and sufficiently explained the basis for the weight he assigned to Dr. Messerly's opinions, including Dr. Messerly's opinions with respect to social limitations, and since those reasons are supported by the record, the Court finds that the ALJ complied with the treating physician rule when assessing Dr. Messerly's opinion. Therefore, reversal and remand is not warranted.

**B.      The ALJ's RFC assessment and Step Five finding are supported by substantial evidence**

Fenderson contends that the RFC and Step Five finding are not supported by substantial evidence arguing that the ALJ ignored supporting evidence concerning Fenderson's social interaction limitations.  Doc. 16, pp. 12-15.  Contrary to Fenderson's claim, the ALJ did not ignore the medical opinion evidence.  Rather, the ALJ considered and weighed Dr. Smith's opinion, giving full weight to Dr. Smith's opinion that Fenderson would have difficulty interacting appropriately with supervisors.  Tr. 22.  Further, the ALJ considered the state agency psychologists' opinions, giving great weight to those opinions, which included the opinion that Fenderson should have no more than superficial interaction with the public, coworkers and supervisors.  Tr. 22.

Fenderson also argues that, because weight was assigned to those other opinions, the ALJ was obligated to adopt those opinions verbatim in the RFC.   However, in assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . .  [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).   Rather, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 416.945(a); 20 C.F.R. § 416.946(c).  Here, consistent with the Regulations, the ALJ weighed and considered all relevant evidence, including the medical opinion evidence, and found that Fenderson had moderate difficulties in social functioning. Tr. 14-15, 19-22.   The ALJ accounted for limitations in social functioning in the RFC, finding that Fenderson's "[i]nteraction with supervisors, coworkers and the public is limited to speaking and signaling." Tr. 16.   Fenderson has not demonstrated that the limitations contained in the RFC do not adequately account for her moderate limitations in social interaction as found by the ALJ.   This is so, especially in light of her daily activities, which included, among other activities, attending support group meetings, going to church and going to the laundromat.  Tr. 14-15, 19-22.

Fenderson also argues that her "testimony cannot simply be disregarded."  Doc. 16, p. 14. The ALJ, however, did not ignore her testimony.  The ALJ discussed and considered both Fenderson's written statements as well as her hearing testimony regarding her mental health issues and assessed the credibility of those subjective statements.  Tr. 16. To the extent that Fenderson has attempted to raise an issue with respect to the ALJ's credibility assessment, she

only reiterates her subjective complaints[15] and presents no legal argument.  Doc. 16, p. 14.

Accordingly, such argument is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th

Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived.  It is not sufficient for a party to mention a

possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." )

(internal citations omitted).

 Contrary to Fenderson's claim, the ALJ did not reinterpret the evidence nor fail to base

his decision on medical evidence. Consistent with the Regulations, the ALJ assessed Fenderson's

RFC based on all relevant evidence and Fenderson has failed to demonstrate that the RFC is not

supported by substantial evidence.  Moreover, the VE testimony upon which the ALJ relied was

provided in response to a hypothetical question that accurately portrayed the social limitations

found by the ALJ as credible and supported by the evidence and contained in the RFC.  Thus, the

ALJ's reliance upon the VE testimony was proper and constitutes substantial evidence to support

the finding of no disability.  *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir.

2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y

of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

## VII. Conclusion

 For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  August 31, 2015

_____
Kathleen B. Burke
United States Magistrate Judge

---

[15] When arguing that her testimony cannot be disregarded, in addition to reiterating her subjective complaints, Fenderson states that she "testified that she was told by Dr. Messerly that she was not ready for a vocational program because supervision was not good for her to be around people and she was not good with authority."  Doc. 16, p. 14.  As discussed herein, the Court finds no error with respect to the ALJ's consideration of Dr. Messerly's opinions.